UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Toraino Pridgen,

    Petitioner,

    v.

Luis Spencer, et al.,

    Respondents.

Civil Action No. 03-12332-RWZ

## PETITIONER'S MEMORANDUM IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. SECTION 2254.

## I. Statement of Facts and Procedural History.

Prior to his trial for: assault on Paul R. Allen with a dangerous weapon with intent to murder him contrary to Massachusetts General Laws (G.L.) c. 265, section 18b(2); assault and battery of Paul R. Allen with a dangerous weapon, a handgun, contrary to G.L. c. 269, section 15A(b); possession of a firearm not being present in his home or place of business without authority to do so, contrary to G.L. c. 269, section 10(a), Petitioner moved to sever his case from that of his brother and Co-defendant, Satron Pridgen. (See "Motion for Relief from Prejudicial Joinder" in Appendix to Toraino

Pridgen's opening Brief in the Massachusetts Appeals Court ("R.A"), pages 7-9; R.A. 4-6).

As grounds for the Motion, Defendant's Counsel affirmed in part:

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

2.  The defendants in this case, Toraino and Satron Pridgen, are brothers who are similar in appearance, age, and physical stature.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

7.  If the defendants are to be tried together, it is expected that present defense counsel for Toraino Pridgen would seek to characterize Satron Pridgen as the shooter and the victim's identification of Toraino Pridgen as a case of mistaken identification.  It is further expected, based on discussion with Satron Pridgen's defense counsel (Attorney Michael McEvilly), that Satron Pridgen at trial would seek to portray Toraino Pridgen as the shooter.

8.  The defense strategies in this case are, therefore, mutually antagonistic to one another.  To acquit one defendant, defense counsel would seek to convince a jury that the other defendant is the culpable party, and vice versa.  One defendant's attempt to exculpate himself would likely inculpate the other, thereby making difficult a fair trial for either defendant.

(Motion for Relief from Prejudicial Joinder, R.A. 7-9).

The Commonwealth opposed severance, informing the Judge that there were a large number of witnesses, and that the victim would testify that both Toraino and Satron Pridgen shot him. (See Transcript of Motion for Severance of 10/1/99; "Commonwealth's Memorandum in Opposition to Defendant's Motion

to Sever," R.A. 15-19). The Court denied the Motion for severance.[1]

_____

[1]. The record reflects that the Motion Judge may have relied on the prosecutor's remarks with regard to the victim's anticipated testimony in denying the motion:

> THE COURT: So I am clear, was the victim ever uncertain as to whether there was one or two shooters?
>
> ASSISTANT DISTRICT ATTORNEY: No, your Honor. He has always maintained there were two shooters.
>
> THE COURT: Well, the motion for severance will be denied.
>
> It is my understanding that the Moran [Commonwealth v. Moran, 387 Mass. 644 (1982)]case is the exception, and that the principles announced in that case apply only in the kind of very unusual situation that was presented there. Moran did indeed have no eyewitnesses, not even any circumstantial evidence to distinguish which of the two defendants had perpetrated the fatal beating, only that both of them had gone with the victim to his truck, and the next thing that anybody knew, the victim was dead, and the only evidence, the best evidence against each defendant was from his own co-defendant, and otherwise there really was no evidence to distinguish who had done what in the course of that beating.
>
> Numerous cases since then have made clear that where there is other evidence, whether the evidence is itself reliable or disputed is not the point, but where there's other evidence such that the jury is not going to be confused about the two, severance is not required merely because one defendant is in substance or in either argument or presentation of testimony going to accuse the other.
>
> Commonwealth v. Sinnott, Commonwealth v. Rogers, Commonwealth v. Martinez all suggest that in this kind of a scenario where there are eyewitnesses, where there's a specific role that is assigned by them to each of the defendants either as a direct perpetrator or as a joint venturer, and I see there will be allegations about that as well, does not require separate trials simply because

At trial, most of the prosecution's eyewitness testimony tended to show that the Co-defendant shot Paul Allen at a crowded and dimly lit party. However, as predicted by defense counsel, there was a great deal of confusion on the part of witnesses when they tried to identify Petitioner and Satron.[2] The victim, who had never met either Petitioner or the Co-defendant, testified that Petitioner shot him in the head, and that he was shot a second time in the chest near where the Co-defendant was standing. The victim testified that just before Petitioner shot him, the Co-defendant nodded in Petitioner's direction. (See "Trial Testimony" of Paul Allen infra).

There was testimony that just prior to the shooting, the Co-defendant brandished a gun and threatened to shoot another man at the party, and that Petitioner was encouraging his brother to shoot this man. (See "Trial Testimony" infra). The trial Judge denied the prosecution's subsequent request for an instruction on transferred intent. (See Tr. III, 19 in Appendix). Neither of the Co-defendants was charged with a

---

one defendant will seek to transfer blame to the other. This appears to me to be in line with those cases.

(Transcript of Motion for Severance of 10/1/99).

[2]. The men are not twins, but the identification problems were similar to what one might expect with witnesses trying to identify twins--witnesses who had known the men since childhood testified with confidence as to their identification, but other witnesses could not tell the men apart.

crime against this man, and no evidence of a common plan or scheme was adduced at trial. The evidence indicated that there was no connection between Brogan and the victim.

There was some testimony that there were two guns fired and that Petitioner had a gun, but this evidence was weak, and the Jury acquitted Petitioner on the charge of possession of a firearm. No motive for the shooting of the victim was established. (See "Trial Testimony" infra.).

Trial Testimony

Nevlina Scott

Ms. Nevlina Scott testified that on the night of October 24 and early morning of October 25, 1998, she had her eighteenth birthday party at her Mother's apartment in Fitchburg. (Tr. I, 88, 92, 94). Scott was collecting money at the door from people before they went into the apartment in case anything was broken during the party. (Tr. I, 94). Scott or her Mother knew some of the people who came to the party, but they did not know others. (Tr. I, 95-96, 135-137).

Scott testified that she knew the Petitioner and his brother Satron Pridgen, the Co-defendant, from grammar school and through a family friend. (Tr. I, 94, 110, 132-134). On the night of the party, Petitioner and the Co-defendant, along with another man and one or two women, arrived at Scott's door. (Tr. I, 95-97, 112, 114). Scott testified that the Co-defendant

began arguing with a Puerto Rican man named Alberto Brogan who was standing at the doorway with her. (Tr. I, 97-99). Scott heard the Co-defendant ask Brogan if he had a problem with "Scooby" and "Shaggy"[3] and said that if Brogan did, he had a problem with the Co-defendant. (Tr. I, 98). Scott asked the Co-defendant and Brogan to leave. The men apparently ignored her. (Tr. I, 99).

Scott testified that she saw the Co-defendant pull a gun out of his pocket and hold the gun to Brogan's temple while repeatedly saying: "I'll XXXXing shoot you. You don't know me, I will XXXXing shoot you". (Tr. I, 99-100). Scott stepped out of the apartment, turned around to look back into the doorway, and then heard a shot. (Tr. I, 100-101). She saw the Co-defendant fire the gun once. (Tr. I, 101, 116, 139-140). She did not see Petitioner. (Tr. I, 116).

Scott saw the Co-defendant backing out of the doorway. She ran around to the back of the apartment to have her Aunt open the back door. (Tr. I, 101). Scott heard two more shots while she was running from the back of the building to the front door. (Tr. I, 101-102, 118). When she got back around to the front of the building, Scott saw her Mother pulling people out of the

---

[3]. The record does not reflect that these individuals were at the party. Scott testified that she knew them from school. (Tr. I, 98-99).

apartment, and the Co-defendant with his hand in the air. (Tr. I, 101-102). She then saw the Co-defendant running out of the house with a gun in his hand. (Tr. I, 102). Scott described the gun as a very small silver revolver. (Tr. I, 102). She did not see Petitioner with a gun. (Tr. I, 114, 148).

People were running out of the apartment. (Tr. I, 101). Scott did not remember where Petitioner was when the Co-defendant came out of the apartment with a gun. (Tr. I, 103). Scott testified that she subsequently saw the Co-defendant and Petitioner go in a particular direction, and then she then saw a car coming from that direction. (Tr. I, 105).

In response to a number of questions regarding the hairstyles of Petitioner and the Co-defendant, Scott testified that she did not remember exactly what hairstyle either man had, but that she thought Petitioner had relatively short hair at the time. (Tr. I, 109, 111-112, 121-130).

The following exchange took place at the end of Scott's direct examination. (Tr. I, 103).

Q  Just backing up to the confrontation that Satron had with Alberto, when Satron was threatening, what was Alberto doing?

A  He was standing there instigating, telling him, "Yeah--"

THE COURT:  You may say to the Jury what you heard him say. Did you hear him say anything, Toraino?

THE WITNESS:  Yes.

THE COURT:  What did he say?

THE WITNESS:  Just "Yeah, yeah, just shoot him.  Just shoot him."

Q  That's what Toraino was doing and saying?

A  Yes.

(Tr. I, 103).

Scott testified that police had not asked her exactly what Petitioner said, and she had not reported the exact words he used in her statements to police.  (Tr. I, 145-157).  On cross-examination, Scott testified that she had previously informed Massachusetts State Police Trooper Hart and Fitchburg Police Detective Maynard that Petitioner had been encouraging Satron to shoot Brogan.  (Tr. I, 106-108, 119-120, 143-150).  She did not testify to the words Petitioner used at the suppression hearing in the case, because neither the Assistant District Attorney nor any other lawyer asked her.  (Tr. I, 107-108, 155).

Bridgette Scott

Bridgette Scott,[4] Nevlina's mother, testified that she arrived home at about 1:30 a.m. on the night of Nevlina's birthday party.  (Tr. I, 160-161).  Mrs. Scott was in the kitchen preparing food when she saw some commotion at the front of the apartment. (Tr. I, 161-162).  A number of people,

---

[4].  Bridgette Scott is referred to as "Mrs. Scott" throughout.

including Paul Allen, the Co-defendant and Petitioner, were gathered near the front door. (Tr. I, 162, 177-178). Mrs. Scott walked through the living room toward the front door and saw the Co-defendant pull out a gun, reach over the crowd, and shoot three times. (Tr. I, 162-165, 177, 198). She began pulling people, including the person with the gun, out the front door by the back of their clothing. (Tr. I, 165, 167-168, 179, 194, 196-197). She then called 911. (Tr. I, 165).

Mrs. Scott had been at a neighborhood nightclub earlier in the evening and had consumed two or three beers. She testified that she did not feel affected by the alcohol. (Tr. I, 160, 170-171). She had seen the Co-defendant at the nightclub. He was wearing a camouflage hat over dreadlocks. (Tr. I, 172, 175, 188-191). Mrs. Scott had known the Co-defendant for years because he had gone to school with her nieces and nephews, and was related to a man she lived with years earlier. (Tr. I, 171, 181-182, 187).

Mrs. Scott testified that she knew Petitioner for the same reasons. She had not seen Petitioner at the nightclub. (Tr. I, 172, 187). Mrs. Scott saw Petitioner in her apartment near the front door when the Co-defendant shot Allen, but did not see Petitioner with a gun, hear him say anything, or otherwise observe Petitioner involving himself with the shooting. (Tr. I, 172-173, 175-178, 199-200). Petitioner did not have a hat on,

and did not have dreadlocks.  (Tr. I, 173).  Mrs. Scott

identified Petitioner and the Co-defendant during her testimony.

(Tr. I, 162-163).

   <u>Paul Allen</u>

   Paul Romeo Allen testified that he ran into Bridgette

Scott, with whom he was casually acquainted, at a nightclub on

October 24, 1998.  (Tr. I, 204).  She invited him to a party at

her house, which he attended with two friends.  (Tr. I, 204-

205).  After noticing what appeared to be an argument between

two men at the door, Allen decided to leave the party.  (Tr. I,

206-207).

   On his way out the door, Allen remarked:  "Excuse me, we

don't really need this here."  (Tr. I, 209).  He felt someone

touch his arm and turned around to see a man he identified in

Court as the Co-defendant staring at him.  (Tr. I, 207-210).

The Co-defendant's hair was in dreadlocks.  (Tr. I, 243-244,

256).  Allen testified that the Co-defendant looked at

Petitioner, who was standing by the door, and nodded.  Allen

characterized the Co-defendant's nod as "a nod in agreement".

(Tr. I, 210-211).  Petitioner's Counsel objected and moved to

strike as follows:

         Q.  What happened next?
         A.  I saw a nod in agreement.  I don't know what
         they were agreeing on--
         MR. STAPLES:  Objection.  Move to strike.
         THE COURT:  He may describe what he saw.

```
Q.  You saw this gentleman nodding toward this
gentleman?
A.  Yes.
Q. Then what happened?
A.  Next thing I know, nod in agreement, I saw--
MR. STAPLES:  Objection, Judge.
THE COURT:  He may describe what he did.  Go
right ahead sir.
.....................................
```

(Tr. I, 210-211).

Allen testified that Petitioner then shot him in the head from a distance of two arm lengths.  (Tr. I, 211-212). Petitioner's hair was shorter than at trial, and not in dreadlocks.  (Tr. I, 243, 255-256).  After the first shot, Allen felt a shot on the other side of his body, to his chest.  (Tr. I, 212).  The Court struck Allen's testimony that Petitioner could not have shot him in the chest because the shot to the chest came from a different direction.  (Tr. I, 234).  Allen testified that the Co-defendant was standing directly in front of him when he was shot in the chest, but he did not see the Co-defendant with a gun.  (Tr. I, 212-213, 222-232).  Allen had never before met or seen either defendant.  (Tr. I, 208, 221).

Allen was taken to the hospital, where seventeen packets of cocaine were found in his clothing, and treated for two gunshot wounds.  (Tr. I, 215-217).  Allen was offered a very favorable settlement of criminal charges brought against him for possession of more than fourteen grams of cocaine and trafficking in cocaine, in exchange for testifying against both

Petitioner and the Co-defendant.  (Tr. I, 217-219, 244-248, 251).

While Allen was in the hospital he was interviewed by police.  Police showed him a photo array, which included Petitioner's photograph and the Co-defendant's photograph. Allen identified the Co-defendant as the person who shot him, and another man, not Petitioner, as also being involved in the shooting.  (Tr. I, 220, 230, 236-240, 251).  A month or more after he had been released from the hospital, and again on December 18, 1998, Allen viewed the same photo array and identified Petitioner as the man who shot him in the head and the Co-defendant as the man standing right in front of him when he was shot.  (Tr. I, 221-222, 230-234, 240).  Allen testified that he was sedated while in the hospital.  (Tr. I, 220-221, 237).

Leonard Beatty

Leonard Beatty testified that he was working as the "DJ" at Nevlina Scott's birthday party.  (Tr. II, 23).  He noticed that Nevlina appeared upset, and approached Nevlina in a crowd of people at the door and asked her what was going on.  (Tr. II, 25).  She said someone had a gun.  (Tr. II, 26).  Beatty approached the people he thought Nevlina was referring to, and said:  "Look, you can't have no guns in here.  You have to leave."  (Tr. II, 26).

The men Beatty was speaking to, one of whom he identified at trial as the Co-defendant, looked like they were pulling weapons out of their clothing. (Tr. II, 26). The men did not say anything to each other, or interact. (Tr. II, 33-34). The Co-defendant, who had dreadlocks and was wearing a "camouflage jungle-type cap," pulled out a gun. (Tr. II, 26-27).

Beatty kicked the second man, whom he alternatively described as a shorter man[5] and as Petitioner, toward the front door. (Tr. II, 27). Beatty testified that he did not see Petitioner with a gun. (Tr. II, 14). The Co-defendant drew the gun, Beatty pushed him against the open door, and the Co-defendant "got off three shots". Beatty grabbed him and threw him out the door then slammed the door shut. (Tr. II, 28). Paul Allen was behind Beatty. (Tr. II, 30). Beatty testified that he did not think the Co-defendant was aiming at anyone. (Tr. II, 31).

On cross-examination Beatty testified that the Defendants looked so much alike at trial that he could not say for certain whether the man with dreadlocks and the gun was the Co-defendant or Petitioner. (Tr. II, 38-40). Beatty previously told police that a picture of Petitioner looked like the man with the gun,

---

[5]. The record does not indicate that Petitioner is shorter than the Co-defendant.

except that the man with the gun had dreadlocks. (Tr. II, 35-38).

### Detective Kenneth Maynard

Fitchburg Police Detective Kenneth Maynard testified that on the night of the shooting he spoke with Nevlina Scott, as did the State Police. (Tr. II, 145-146). Nevlina Scott never indicated that Petitioner had a role in shooting Mr. Allen, either when Maynard spoke to her on October 25, 1998, or in two subsequent interviews. (Tr. II, 170-174).

On October 27, 1998, Maynard visited Paul Allen in the hospital. (Tr. II, 149). Maynard had called the hospital to inquire whether Allen was under heavy medication prior to visiting him. (Tr. II, 164). Maynard testified that Allen appeared to be clear-minded at the time, but was in some discomfort. (Tr. II, 150, 165). Allen viewed a photo array that included Petitioner's picture, but identified Satron Pridgen as the man who shot him. (Tr. II, 151). Allen picked out the photograph of another person and said: "This one looks like the one that was with him". (Tr. II, 168). Allen did not say anything that indicated Petitioner had a role in the shooting. (Tr. II, 167-168).

On November 11, 1998 Maynard had a second interview with Allen. (Tr. II, 152). Maynard showed Allen the same photo array, and asked Allen "who was having the argument with the

Hispanic," and Allen selected Satron Pridgen. (Tr. II, 153).
Maynard testified that Allen said "the other guy that shot him
in the head was standing at the doorway" and identified
Petitioner. (Tr. II, 153). Maynard had a third interview with
Allen on December 18, 1998, showed him the same photo array, and
again asked Allen who shot him. (Tr. II, 152-153). Allen again
identified Petitioner as the person in the doorway who shot him.
(Tr. II, 154).

Maynard interviewed Petitioner after he was arrested. (Tr.
II, 155). Petitioner's hair was shorter than it was at trial.
(Tr. II, 161). Petitioner stated in response to questioning:
that he was not at the party, then that he was at 52 Meadowbrook
Lane very briefly but did not go in to the party, or that "he
was in and out"; and "I didn't shoot nobody". Maynard also
testified that: "at one point [Petitioner] said that...Satron
wasn't even there". (Tr. II, 155-159, 162-163). Petitioner did
not have a gun when he was arrested. (Tr. II, 163-164).

Officer Thomas Leger

Fitchburg Police Officer Thomas Leger responded to the
Scotts' apartment and spoke with Leonard Beatty who identified
the person who fired the shots as Co-defendant Satron Pridgen.
(Tr. II, 41, 45-46). Beatty described the Co-defendant as
wearing a camouflage hat with a blue stripe around it, and a
red, white and blue striped shirt. Beatty told Officer Leger

that he kicked another individual out the door, but he could not give a description of that second individual. Beatty reported that the second individual did not fire any shots. (Tr. II, 47).

### Trooper John Schrijn

Trooper John Schrijn testified that he worked for the Massachusetts State Police in the firearms identification section. (Tr. I, 261). He recovered two bullet casings from the Scott's apartment on the night of October 25, 1998. (Tr. I, 263). Both of the bullets were fired from the same gun, but Schrijn did not know what gun. (Tr. I, 267).

### Other Identification witnesses

Several of the witnesses involved in the arrests of the Defendants could not distinguish the men at trial. Leominster Police Sergeant George Brewer mistakenly identified the Co-defendant in court as the man he arrested. (Tr. II, 115-117). Leominster Police Officer Emanuel Tocci had difficulty in court identifying which of the two men he arrested. (Tr. II, 122). Leominster Police Officer Jesus Morales could not identify which of the Defendants he saw on the day Petitioner was arrested. (Tr. II, 128). Massachusetts State Police Detective Michael Peaslee first identified one of the Defendants, and then the other, as the man he observed when Petitioner was arrested. (Tr. II, 133-135).

## Motion to Dismiss for Insufficiency of the Evidence

At the close of the evidence, Petitioner moved for a required finding of not guilty. The motion was denied. (Tr. III, 32-33).

## Verdicts and Sentencing

Petitioner and the Co-defendant were found guilty of assault and battery with a dangerous weapon by special verdicts finding liability based on joint venture. (Tr. III, 150-151; see special "Verdict Slip," R.A. 10; Jury Instruction on joint venture, R.A. 20-25). Both Defendants were acquitted of assault with a dangerous weapon with intent to murder. Petitioner was acquitted of possession of a firearm. (Tr. III, 147-152).

Petitioner was sentenced to incarceration of not less than nine years, nor more than ten years (Tr. IV, 14), which he is at present serving in the Massachusetts correctional system at Bridgewater, Massachusetts.

## Procedural History

The Defendant filed a Notice of Appeal on November 19, 1999. (R.A. 1-3). The case was entered on the docket of the Appeals Court on January 12, 2001. The direct appeal was decided, without being scheduled for oral argument, pursuant to Appeals Court Rule 1:28. The Decision of the Appeals Court, reported at 54 Mass. App. Ct. 1110, 765 N.E.2d 827 (2002), was issued on April 8, 2002.

Petitioner's Application for Further Appellate Review was denied by the Massachusetts Supreme Judicial Court on June 6, 2002. Mr. Pridgen filed a Petition for a Writ of Certiorari in the United States Supreme Court, which was denied on November 12, 2002.

ARGUMENT

## I.   The Trial Evidence is Legally Insufficient and Petitioner's Conviction Violates the Fourteenth Amendment to the United States Constitution.

The State Court did not decide Petitioner's federal constitutional claim that the evidence is legally insufficient for conviction under the Fourteenth Amendment to the United States Constitution.   Therefore, the standard of review in this Honorable Court of Petitioner's first claim is de novo.  Fryar v. Bissonnette, 318 F.3d 339 (1st Cir. 2003); Dibenedetto v. Hall, 272 F.3d 1 (1st Cir. 2001); Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001).

The State Court decision does not cite any federal authority in its discussion of insufficiency of the evidence.[6]

---

[6].   Of course Massachusetts law on sufficiency of the evidence in criminal cases, like the criminal law of the other States, tracks the federal standard for proof beyond a reasonable doubt of each element of a crime charged to sustain a conviction. Fourteenth Amendment, United States Constitution; Commonwealth v. Salemme, 395 Mass. 594, 595, 481 N.E.2d 471 (1985); Commonwealth v. Latimore, 378 Mass. 671, 677, 393 N.E.2d 370 (1979).  However, here, the Massachusetts intermediate appellate Court focused its analysis on the general requirements of the State's joint venture rule, and whether on the facts of the case, the Jury could have found Petitioner guilty as either a principal or joint venturer, rather than whether the evidence was sufficient for the theory of liability, joint venture, on which the Jury in fact convicted.  Sullivan v. Louisiana, 508 U.S. 275, 279; 113 S. Ct. 2078; 124 L.Ed.2d 182 (1993)(a criminal defendant is constitutionally entitled to a jury verdict that he is guilty of the crime); Griffin v. United States, 502 U.S. 46; 112 S. Ct. 466; 116 L.Ed.2d 371 (1991)(jurors are well equipped to determine whether a particular theory of liability is supported by the facts).

Dibenedetto v. Hall, supra; (See the Appeals Court Decision,

attached hereto as Appendix A, pages 3-5). Nor do any of the

six cases cited in the State Court's discussion of this issue,

themselves cite federal authority on the point. Dibenedetto v.

Hall, supra; compare McCambridge v. Hall, 303 F.3d 24, 30-31

(1st Cir. 2002).

In the alternative, if this Honorable Court should

determine that the State Court did decide Petitioner's first

claim under federal law, Petitioner respectfully submits for the

reasons discussed below, that the State Court decision involves

an unreasonable application of clearly established federal law.

Williams v. Taylor, 529 U.S. 362, 146 L.Ed.2d 389, 120 S. Ct.

1495 (2000); McCambridge v. Hall, supra at 32-36; 28 U.S.C.

section 2254(d)(1). If the State Court is determined to have

decided the federal Due Process issue raised by the sufficiency

of the evidence, its decision is unreasonable because the

---

Consequently, the State Court did not squarely address the
bedrock issue of whether the evidence established proof beyond a
reasonable doubt of every element of the indicted offense beyond
a reasonable doubt consistent with the United States Supreme
Court jurisprudence interpreting the Fifth and Fourteenth
Amendments to the United States Constitution. (See Decision at
3-5 and cases cited; United States v. Gaudin, 515 U.S. 506; 115
S. Ct. 2310; 132 L.Ed.2d 444 (1995)(a jury verdict that a
defendant is guilty of a crime means a verdict that he is guilty
of each necessary element of the crime); Vachon v. New
Hampshire, 414 U.S. 478, 480; 94 S. Ct. 664; 38 L.Ed.2d 666
(1974)("It is beyond question, of course, that a conviction
based on a record lacking any relevant evidence as to a crucial
element of the offense charged...violate[s] due process.").