UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
TORAINO PRIDGEN,                )
        Petitioner,             )
                                )
v.                              )     Civil Action No. 03-12332-RWZ
                                )
LUIS SPENCER,                   )
        Respondent.             )
_____)
```

## RESPONDENT'S MEMORANDUM IN OPPOSITION TO THE PETITION FOR HABEAS CORPUS

The respondent, Luis Spencer, through counsel, hereby submits his memorandum of law in opposition to the petition for a writ of habeas corpus filed by Toraino Pridgen ("the petitioner"). As argued in this memorandum, the petition should be denied where the state court's adjudication was not an unreasonable application of clearly established Supreme Court law.

## PRIOR PROCEEDINGS

On January 14, 1999, a Worcester County, Massachusetts, grand jury returned a three count indictment against the petitioner for the following offenses: assault and battery with a dangerous weapon, in violation of G.L. c. 265, §15A; unlawful possession of a firearm in violation of G.L. c. 269, § 10; and armed assault with intent to murder, in violation of G.L. c. 265, §18. *See* SA:1.[1] On November 17, 1999, after a jury trial,

_____

[1]  The respondent herein references his Supplemental Answer, containing the state court materials from the petitioner's trial and appeal, as "SA" followed by the exhibit number. The trial transcripts, which were filed as a further supplemental answer, will be references by volume

Sosman, J., presiding, the petitioner was found guilty of assault and battery with a dangerous weapon and not guilty of the remaining counts. *See* SA:1. On November 19, 1999, the trial judge sentenced the petitioner to nine to ten years in state prison. *Id.* On November 29, 1999, the petitioner timely noticed his appeal from his conviction. *Id.*

The petitioner appealed his convictions to the Massachusetts Appeals Court ("Appeals Court") and presented the following claims: (1) the denial of the defendant's motion for severance was error and deprived him of a fair trial; and (2) the evidence at trial was insufficient to establish proof beyond a reasonable doubt that the defendant acted as a joint venturer. *See* SA:1, 3, 4. On April 8, 2002, the Appeals Court affirmed the petitioner's convictions in an unpublished opinion pursuant to Mass. R. App. Prac. 1:28. *Commonwealth v. Pridgen*, 54 Mass. App. Ct. 1110, 765 N.E.2d 827 (2002). *See* SA:4. The petitioner then filed an Application for Leave to Obtain Further Appellate Review ("ALOFAR") in the Massachusetts Supreme Judicial Court ("SJC") and presented the following claims: (1) severance is required upon timely motion where the Commonwealth's evidence establishes that one or the other of two co-defendants, but not necessarily both, committed an indicted offense, presents an important issue of public policy, the resolution of which would further the interests of justice and the efficient administration of justice; and 2) the defendant was denied his constitutional right to due process of law under Article Twelve of the Massachusetts Declaration of Rights and the

and page number (Tr. --/--).

2

Fourteenth Amendment to the United States Constitution where the only admissible evidence of a joint venture is testimony that the co-defendant "nodded" in the defendant's direction prior to committing a crime. *See* SA:5. On June 2, 2002, the SJC denied the petitioner's ALOFAR. *Commonwealth v. Pridgen*, 437 Mass. 1103, 772 N.E.2d 588 (2002). See SA:6. The petitioner filed a petition for writ of certiorari in the United States Supreme Court, and this petition was denied on November 12. 2002. *Pridgen v. United States,* 537 U.S. 1020 (2002).

On November 7, 2003, the petitioner filed a petition for writ of habeas corpus with this Court. The respondent filed an Answer, Supplemental Answer, and Motion to Dismiss for Failure to Exhaust State Court Remedies on February 2, 2004. This court denied the motion to dismiss on March 16, 2004. The petitioner filed a memorandum in support of the habeas corpus petition on May 3, 2004.

## STATEMENT OF FACTS

The following recitation of the evidence is taken from the Commonwealth's brief to the Appeals Court and the trial transcripts:

At a late night birthday party held in Fitchburg during the early morning hours of Sunday, October 25, 1998, two brothers who were not invited to the party, and who were strangers to the victim, shot Paul Romeo Allen ("the victim") twice "at close range," once in the head and once in the chest. (Tr. I/90, 94, 97-101, 115-116, 166, 208, 212, 221, 241-242; II/67, 69; III/148-151). The victim and other witnesses at the party said that, when

3

the shots were fired, defendant Toraino Pridgen was standing to the left of the victim, about "[t]wo arms' length[s]" away, and his brother, Satron Pridgen, was standing "right in front" of the victim, facing him. (Tr. I/209-210, 213, 220, 225-227, 231-234, 260). Satron was wearing his hair in "dreadlocks" that were not very long and two witnesses said he had on a "gray and black camouflage hat"; with his "dreads" showing below the hat around his ears (Tr. I/172-175, 178, 188-190, 197, 210, 230, 236-238, 243-244, 256-257, 260; II/27, 34-35, 37-39, 56). The petitioner had "fairly short" hair, a "low hairstyle," which was not very long, and was not wearing a hat (Tr I/121, 173-174, 243, 256).

Nevlina Scott hosted the party at her mother's apartment and knew the two brothers "on a casual basis . . . [from] seeing them in the neighborhood," and she knew Toraino through school. (Tr. I/110). Nevlina's mother, Bridgette Scott, also knew the Pridgen family (Tr. I/132-134, 171, 180-182, 185-186).

The victim arrived at the party at approximately 1:45 a.m., after having worked as a DJ at a wedding and then gone to a nightclub called "Boomer's" for half an hour (Tr. I/202-203, 205, 258). There were between twenty and fifty people at the party (Tr. I/110-111; II/32, 44). Nevlina was standing at the front door of the apartment, collecting money and greeting people (Tr. I/94, 138-139, 157-158, 171, 254). It was "dim" inside the apartment and a strobe light was flashing on and off, but light flooded in from a light outside over the front door whenever the door was open (Tr. I/96, 165, 200, 240-241).

4

When the petitioner and his brother arrived, they asked Nevlina what was going on inside (Tr. I/96). When Nevlina told them, they decided not to stay and left the apartment (Tr. I/I/96). The petitioner and his brother returned about five to ten minutes later with two other people and said they wanted to enter the party (Tr. I/96, 97, 114-115). They entered the apartment, but came out about five minutes later and told Nevlina that they wanted their money back (Tr. I/97, 112). At that time, both the petitioner and his brother got into a confrontation with Alberto Brogan, who was at the doorway with Nevlina (Tr. I/97-98, II/173-174). Nevlina told them that she did not want any problems in the house, but they kept arguing (Tr. I/99). Nevlina then saw the petitioner's brother, Satron, pull a gun out of his pocket and put it to Alberto's temple and tell him "I'll fucking shoot you. You don't know me, I will shoot you." (Tr. I/99-100, 115). While Satron was threatening Alberto, Nevlina could hear the petitioner instigating his brother and "pumping him up," saying, "yeah, yeah, just shoot him." (Tr. I/103). Nevlina never saw the petitioner with a gun (Tr. I/114).

The victim was standing in the living room in front of the DJ booth when he observed the confrontation between Satron Pridgen and Alberto Brogan (Tr. I/206-209). He walked toward the door and told the two men, "Excuse me, we really don't need this here." (Tr. I/207, 209). As the victim continued walking, Satron Pridgen touched his hand and stared him straight in the eye (Tr. I/209-210). Satron then looked at the petitioner, who was on the other side of the victim and they nodded at each other (Tr.

I/210-211). As the victim turned towards the door, the petitioner pointed a gun at his head and shot him (Tr. I/211-212). He then felt a "burning sensation" in his chest and realized that he had been shot in the chest (Tr. I/212-213). Satron was standing in front of him and the petitioner was to his left (Tr. I/210, 212-213). The victim only saw one gun, the one in the petitioner's hand (Tr. I/243, 251-252).

After the shooting, Nevlina saw the petitioner and his brother head up toward a "little hill," and "saw a car come down the hill from there" (Tr. I/103, 105). Officers arriving at the scene saw "several cars" pass them, coming down the hill "at high rates of speed" (Tr. II/441-42).

The victim was taken to UMASS Medical Center where the attending physician, Dr. Counihan, testified that the victim had been shot twice at close range and that both injuries were potentially life-threatening (Tr. II/72-73). After weighing the risks and benefits of removing the bullets, the doctors left both bullets in the victim's body (Tr. I/216; II/69, 71). Experts could not determine the caliber of the bullets from CAT scans or x-rays (Tr. I/269-270, 275-276).

Two days after the shooting, Detective Maynard of the Fitchburg Police visited the victim at the hospital to show him a photo array (Tr. I/219-220). The victim was lucid but still sedated with morphine (Tr. I/220-221). That day, he picked a photo of Satron Pridgen as the shooter (Tr. I/230; II/151, 165-168). On November 11, 1998, when the victim was out of the hospital and no longer using pain medication, he met with Detective

Maynard again at the Fitchburg police station (Tr. I/221, 230, II/152).  When Detective
Maynard showed him the same photo array that he'd seen at the hospital, he pointed to
Satron Pridgen as the man who was arguing with Alberto Brogan and the petitioner as the
man who shot him in the head (Tr. I/207, 211-212, 221-222, 230-231; II/153).  On
December 18, 1998, the victim was shown the same array again and pointed to the
petitioner as the person who shot him in the head and to Satron as the person who was
standing close to him (Tr. I/154; II/211-212, 232-234).

Leonard Beatty, the DJ at the party, saw the petitioner and his brother at the door,
moving like they were drawing a weapon out and saw the man "who had dreads on" and
"one of those camouflage jungle-type caps" pull out a gun (Tr. II/26-27, 33-35, 37, 39).
He saw the other man, without the dreadlocks, reaching into his coat, but he never saw
that man with a gun (Tr. II/27, 34, 35, 47).  At trial, Beatty initially identified Satron as
the man with the gun who was wearing dreadlocks (Tr. II/26, 38, 39), and he told police
at the scene that the shooter was Satron (Tr. II/34-35, 45-47).  He conceded, however, that
the two brother "both look[ed] pretty close to each other" in appearance, and that they
"look[ed] different" at trial than they had that night in the dim apartment (Tr. II/39-40).

Two days after the shooting, on October 27, 1998, the police arrested the petitioner
after tracking him to a Motel 6 in Leominster; he fled into the woods, where dogs were
called in to look for him, and then to the Searstown Mall, where he bounced off a car in
the road while being chased by three police officers (Tr. I/280-282; II/114-115, 119-121,

7

125-127, 131-133, 135-136, 141, 159).  A mall security guard eventually tackled the petitioner in the mall parking lot (Tr. II/115, 121, 127-128, 141).  The police did not find any weapons on the petitioner at the time of his arrest (Tr. II/163-164).  When questioned after his arrest, the petitioner first told the police that he hadn't been at the party; then he said he had been there, but he hadn't gone inside (Tr. II/155-158, 162).

## ARGUMENT

### STANDARD OF REVIEW

Because the subject petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("the AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir.2000) ("a federal [habeas] court operates within a closely circumscribed sphere").  In relevant part, the AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d)(2). In addition, under the AEDPA, state-court determinations of factual issues "shall

be presumed to be correct," unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state-court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (1) "if the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases; or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme court] precedent." *Taylor*, 529 U.S. at 405-06. Under either scenario, to satisfy the "contrary to" clause, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme court precedent. *Id.*

A state-court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 413. In making this determination, a habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. The same objective unreasonableness standard applies to the "unreasonable determination of facts prong of § 2254(d)(2). *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Taylor*, 529 U.S. at 410. As the *Taylor* decision makes clear, however, an unreasonable state-court determination is not the

equivalent of an incorrect one. *Id.* "Indeed, because Congress used the word 'unreasonable' . . . and not words like 'erroneous' or 'incorrect,' a federal habeas court 'may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application [or determination] must also be unreasonable.'" *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (quoting *Taylor*, 529 U.S. at 411), *cert. denied*, 534 U.S. 925 (2001). As this Court sitting en banc recently held, "'some increment of incorrectness beyond error is required' . . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). If, for instance, the state court reaches a determination that is "devoid of record support for its conclusion or is arbitrary," the AEDPA's unreasonable application prong may be satisfied. *Id.* at 36-37 (citing *O'Brien v. Dubois*, 145 F.3d 16, 25 (1st Cir. 1998)).

I.    **THE STATE COURT'S DETERMINATION THAT THE EVIDENCE WAS SUFFICIENT TO CONVICT THE PETITIONER UNDER A JOINT VENTURE THEORY WAS NOT AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT PRECEDENT.**

A.    The Petitioner is Not Entitled to De Novo Review.

The petitioner claims that he is entitled to de novo review of his sufficiency claim because the state court did not decide his federal constitutional claim (Pet. Memo p. 19). *See DiBenedetto v. Hall*, 272 F.3d 1, 6-7 (1st Cir. 2001); *Fortini v. Murphy*, 257 F.3d 39, 47

10

(2001). Although the Appeals Court reviewed the claim pursuant to the state law rules of joint venture liability, the underlying determination was whether the evidence met the standard for sufficiency of the evidence articulated in *Commonwealth v. Latimore*, 387 Mass. 671, 393 N.E.2d 370 (1979). The Appeals Court held that "[t]he evidence of joint venture was clearly sufficient." See Supp. Ans. 4, p. 1. Under *Latimore*, the evidence is sufficient if any rational trier of fact, having heard the evidence and drawn reasonable and permissible inferences therefrom, could find each and every element beyond a reasonable doubt. *Latimore*, 378 Mass. at 677, 393 N.E.2d at 374. Moreover, in *Latimore*, the Massachusetts Supreme Court held that that standard of review is the functional equivalent and "substantially comparable" to the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Id*. Therefore, the petitioner cannot now claim that the state court did not address his federal constitutional claim and this court should apply the standard set forth in 28 U.S.C. § 2254.

    B.    The Appeals Court's Holding That The Commonwealth Presented Sufficient
          Evidence That The Petitioner Acted as a Joint Venturer With His Brother Was
          Not an Unreasonable Application of *Jackson v. Virginia*.

    Since the Appeals Court applied the proper Supreme Court precedent to the petitioner's sufficiency of the evidence claim, this court must now determine whether the state court's decision was an unreasonable application of *Jackson v. Virgina*, *supra*. *See Hurtado v. Tucker*, 245 F.3d 7, 15 (1st Cir. 2001). As this court made clear in *Hurtado*, "[h]abeas review involves the layering of two standards. The habeas question of whether the

state court decision is objectively unreasonable is layered on top of the underlying standard governing the constitutional right asserted." *Id.* at 16. Here, as in *Hurtado,* the "constitutional right is governed by *Jackson*'s test of 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"*Jackson*, 443 U.S. at 319. In this context, the petitioner seeks to challenge the sufficiency of the Commonwealth's evidence of the petitioner's participation in the crime as a joint venturer pursuant to Massachusetts common law. The petitioner claims that the Appeals Court's decision was an unreasonable application of *Jackson* because it was devoid of record support. (Pet. memo, pp. 20-21). This argument must fail.

Here, there was ample evidence to demonstrate the reasonableness of the Appeals Court's determination. Under Massachusetts law, one may be found guilty as a joint venturer in either of two ways. *Commonwealth v. Ortiz*, 424 Mass. 853, 856, 679 N.E.2d 1007, 1009 (1997). A defendant can be convicted as a joint participant in a felony, if he was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Commonwealth v. Longo*, 402 Mass. 482, 486, 524 N.E.2d 67 (1988), *quoting Commonwealth v. Bianco*, 388 Mass. 358, 366, 446 N.E.2d 1041, *S.C.*, 390 Mass. 254, 454 N.E.2d 901 (1983). A defendant may also be convicted as a joint participant in a felony if he "aids in the commission of a felony, or is an accessory

12

thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed." G. L. c. 274, § 2. *Commonwealth v. Raposo*, 413 Mass. 182, 184-185, 595 N.E.2d 773 (1992). *See* Nolan & Henry, Criminal Law § 633, at 521-523 (2d ed. 1988 & 1999 Supp.). While the statute requires something more than mere acquiescence, physical participation is not required so long as there is "association with the criminal venture and any significant participation in it." *Commonwealth v. Raposo*, 413 Mass. at 185, 595 N.E.2d 773, *quoting Commonwealth v. Morrow*, 363 Mass. 601, 609, 296 N.E.2d 468 (1973). In general, the point of difference between the two theories is the factor of the defendant's presence at the scene of the felony. *Commonwealth v. Ortiz*, 424 Mass. at 856, 679 N.E.2d at 1009. *See Commonwealth v. Echavarria*, 428 Mass. 593, 598, 703 N.E.2d 1137, 1140-1141 (1998). The petitioner does not dispute the finding that he was present at the scene of the crime, but alleges that the evidence was insufficient to find the other two elements beyond a reasonable doubt (Pet. memo, p. 23).

Specific to the issue of a joint venture, the Appeals Court stated:

> The evidence was ample that in confrontations, first with Brogan and then with Allen, the Pridgen brothers were acting in concert. Included in this evidence is Toraino's encouraging Satron to shoot when Satron put a gun to Brogan's temple (Tr. I/103-107, 145-147, 148-149, 155-157), as well as a nod in agreement exchanged between Satron and Toraino just before Allen was shot.

*Commonwealth v. Pridgen*, 54 Mass. App. Ct. at 1110, 765 N.E.2d at 827. See S.A: 4.

Indeed, at trial, the evidence established the petitioner not only was present at the party with his brother but also had knowledge or shared an intent to commit a crime as

evidenced by his encouragement to Satron when Satron pointed a gun at Brogan's head shortly before the victim was shot. Moreover, it was the Pridgens' argument with Brogan that prompted the victim to come over and enter into an already heated argument. His attempt to stop the encounter precipitated the chain of events in which Satron looked at the petitioner and nodded as the petitioner pointed a gun at the victim's head and shot him while Satron shot him in the chest (Tr. I/206-213). Finally, the victim himself identified the petitioner as the person who shot him in the head (Tr. I/211-212, 223-225). Thus, the evidence showed that "'[a]t the climactic moments the [petitioner and his brother] consciously acted together in carrying out [a] criminal endeavor.'" *Commonwealth v. Allison*, 434 Mass. 670, 676, 751 N.E.2d 868, 879 (2001). "The jury may infer the requisite mental state [to commit the crime] from the defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth v. Elliot*, 430 Mass. 498, 500, 721 N.E. 2d 388, 390-391 (1999), citing *Commonwealth v. Soares*, 377 Mass. 461, 470, 387 N.E.2d 499 *cert. denied*, 444 U.S. 881 (1979). Even though there was some dispute among the witnesses at the party as to who actually shot the victim, "[d]irect evidence of who shot the victim[] 'is not required where, as here, there is strong circumstantial evidence that one of the [assailants] shot' the victim[]." *Commonwealth v Cohen*, 412 Mass. 375, 381, 589 N.E.2d 289 (1992), quoting *Commonwealth v. Casale*, 381 Mass. 167, 174, 408 N.E.2d 841 (1980).

The evidence also sufficed to show that the petitioner "by agreement [was] willing and available to help the other if necessary" to fulfill the third element of joint venture. The jury

14

heard that the petitioner and his brother arrived at the party together, stayed together in the doorway, argued with Brogan together, "nodded" to each other before the victim was shot, and then, after shooting him, fled together up the hill and away in a car. "A rational jury could infer from [all] this that they were available and willing to help each other if necessary," and that, in fact, they did help each other. *Commonwealth v. Williams*, 422 Mass. 111, 121, 661 N.E.2d 617 (1996), quoting *Commonwealth v. Santos*, 402 Mass. 775, 787, 525 N.E.2d 388 (1988). "Furthermore, there was evidence that the [two] defendant[s] fled the scene, [and] hid from the police. . ., and that [the petitioner] gave inconsistent stories about his activities on the evening in question (Tr. I/158-159), all of which are actions that evince a consciousness of guilt." *Commonwealth v. Cohen*, 412 Mass. at 380, 589 N.E.2d 289.

"The ultimate question on habeas review . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable." *Hurtado*, 245 F.3d at 20, citing to *O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998). From the above evidence, the Appeals Court's decision that the petitioner was guilty as a joint venturer was abundantly reasonable. It is the commission of a crime, the defendant's intentional assistance of the principal in the commission of the crime, and the defendant's sharing in the mental state or intent required for the crime, that define the joint venture. As such, if members of the jury disagree as to whether the defendant actually wielded the gun, the shared mental state ties all the joint venturers together, "making irrelevant who did what in the shared enterprise."

*Commonwealth v. Ramos*, 31 Mass. App. Ct. 362, 368, *rev. den.*, 411 Mass. 1103, 577 N.E.2d 1012 (1991). The petitioner has offered nothing, let alone clear and convincing evidence, to rebut the presumed correctness under 28 U.S.C. §2254(e)(1) of the Appeals Court's findings of fact, *see Avellar v. DuBois*, 30 F.Supp.2d at 79; *Otsuki v. DuBois*, 994 F.Supp. at 51 & n.3, which includes deference to inferences drawn by the state court from those factual determinations. *See Parke v. Raley*, 506 U. S. at 35; *Flores v. Marshall*, 53 F.Supp.2d at 514. He is not entitled to habeas relief on this claim.

## II.   THE STATE COURT'S DETERMINATION THAT THE PETITIONER'S MOTION FOR SEVERANCE WAS PROPERLY DENIED WAS NOT AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW.

### A.    The Petitioner is Not Entitled to De Novo Review.

The petitioner claims that he is entitled to de novo review of this claim as well because the Appeals Court did not address the federal nature of his claim (Pet. memo, pp. 33-34). He is correct that, pursuant to *Fortini v. Murphy*, 257 F.3d 39 (1st Cir. 2001), AEDPA's strict standard of review only applies to a "claim that was adjudicated on the merits in state court proceedings." 28 U.S.C. § 2254(d). However, to the extent that the Appeals Court did not address the petitioner's federal constitutional claim, it was because the petitioner did not raise the federal nature of the claim in the state court. Where he merely mentioned the federal bases for his claims, without making any further argument as to why his federal rights had been violated, the state courts were not sufficiently alerted to the

federal nature of his claim.[2]

Although *Commonwealth v. Moran*, 387 Mass. 644, 442 N.E.2d 399 (1982), on which the petitioner relied in the state court, cited to the federal right to confrontation and *Bruton v. United States*, 391 U.S. 123 (1968), the petitioner did not rely on these federal claims in his brief, instead citing to Mass. R. Crim. P. 9(d). The Appeals Court even stated in its decision that "the severance motion was presented to the judge not as a *Bruton* motion, see *Bruton v. United States*, 391 U.S. 123 (1968), but on the authority of those cases addressing severance in the context of mutually antagonistic and irreconcilable defenses." *Commonwealth v. Pridgen*, 54 Mass. App. Ct. at 1110, 765 N.E.2d 827; S.A. 4. The petitioner's failure to exhaust this claim is also obvious in light of the fact that, represented by the same counsel who represented him on direct appeal, he now cites to and relies on Supreme Court precedent, *Zafiro v. United States*, 506 U.S. 534 (1993) and *Bruton v. United States*, 391 U.S. 123 (1968), for the first time in his memorandum in support of his habeas corpus petition. (Pet. memo p. 40-46). Therefore, the petitioner should not receive de novo review of federal claims which he now fully develops for the first time in his federal habeas

---

[2] In his brief to the Appeals Court, the petitioner couched his claim on the language of Mass. R. Crim.P. 9 (d) and on the common law of Massachusetts which holds that a denial of a motion for severance is an abuse of discretion when a defense conflicts with that of a co-defendant to the point of being mutually antagonistic and irreconcilable. *Commonwealth v. Moran*, 387 Mass. 644, 658 (1982). His fleeting reference to the Fourteenth Amendment in that brief and in his application for further appellate review to the Supreme Judicial Court was not sufficient to alert the Appeals Court to the federal nature of his claim. See S.A. 1, 5. The respondent filed a motion to dismiss for failure to exhaust state court remedies but this Court denied the motion.

corpus petition.

      B.    The Appeals Court's Decision Was Not Based On an Unreasonable Determination of the Facts.

The petitioner argues that the Appeals Court's decision was based on an unreasonable determination of the facts. In order to overcome the presumption of correctness afforded the state court's factual determinations, the petitioner must rebut them by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This the petitioner has failed to do.

The Appeals Court based its decision to uphold the denial of the severance motion on the facts that, unlike in *Moran*, in which the victim was murdered and the only witnesses were the two co-defendants who blamed each other, "there was proof available from witnesses other than the co-defendants to establish who committed the crime and the manner of its accomplishment." *Commonwealth v. Pridgen*, 54 Mass. App. Ct. at 1110, 765 N.E.2d 827; SA 4. Therefore, contrary to the petitioner's assertion, there was more evidence presented than just the two defendants placing blame on each other. Other witnesses identified the brothers as being at the party and threatening another man with a gun before shooting the victim and victim himself identified both defendants as the shooters.

The Appeals Court then went on to hold that the petitioner's assertion that his only realistic defense was to inculpate his brother was in fact not borne out by the record. *Id*. This factual determination was correct. Defense counsel strongly impeached the credibility of the eyewitnesses by getting them to admit that they could not remember details of the defendants' appearances the night of the party and told police inconsistent versions of event

(Tr. I/106-112, 121-128, 171-179, 235-242; II/33). Moreover, although the petitioner suggested in his closing argument that his brother was the shooter, his brother did not attempt to cast blame back on the petitioner in his closing, but instead highlighted the inconsistencies in the identification evidence (Tr. III/68-84). In any event, the Commonwealth's joint venture theory did not require that the jury be convinced that the petitioner actually shot the victim, but only that he was participated in the crime by sharing his brother's intent and was available to assist him. See Argument II, *supra*. Therefore, the petitioner has failed to present clear and convincing evidence[3] to rebut the facts on which the state court relied to come to its conclusion that the petitioner's severance motion was properly denied.

C.    The State Court's Conclusion that Severance Was Not Required Was Not An Unreasonable Application of Clearly Established Supreme Court Law.

Although the petitioner did not adequately raise his federal constitutional claim to the state courts, the Appeals Court's decision was not an unreasonable application of Supreme Court cases dealing with severance. See *Early v. Packer,* 123 S. Ct. 362, 365 (2002) (a state court need not cite Supreme Court cases to avoiding violating the "contrary to" prong of §2254(d), "so long as neither the reasoning nor the result of the state-court decision contradicts them").

---

[3] The petitioner's further argument that the Appeals Court's reliance on the fact that the petitioner and his brother nodded to each other "in agreement" before shooting the victim (Pet. Memo pp. 37-39) also fails to constitute clear and convincing evidence to rebut the presumption of correctness, because although the petitioner objected to the characterization (Tr. I/211), the jury was clearly warranted in drawing that conclusion as a reasonable inference. *Latimore*, 378 Mass. at 677, 393 N.E.2d at 374.

In determining that the trial court properly denied the petitioner's severance motion, the Appeals Court rejected his allegation that he and his brother presented "mutually antagonistic" defenses, and in the alternative held that even if the defenses were mutually exclusive, they did not present such compelling prejudice as to prevent either defendant from obtaining a fair trial. *Commonwealth v. Pridgen*, 54 Mass. App. Ct. at 1110, 765 N.E.2d 827; SA: 4. This holding was in no way an unreasonable application of the Supreme Court precedent relied on by the petitioner. In *Zafiro v. United States*, 506 U.S. 534, 538 (1993), the Supreme Court held that "mutually antagonistic defenses are not prejudicial per se" and that severance should be granted only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Thus, the Supreme Court rejected a "bright-line rule, mandating severance whenever co-defendants have conflicting defenses" in favor of a case specific evaluation of prejudice from a joint trial.

Contrary to the petitioner's first contention that the joint trial created a danger that the jury unjustifiably inferred that both defendants were guilty, the evidence was sufficient to prove that both defendants participated in the shooting pursuant to a joint venture. *See* Argument II, *supra*. The fact that the jury found both defendants guilty as joint venturers and neither as a principal is not precluded under the Massachusetts common law regarding joint venture liability. *Commonwealth v. Ramos*, 31 Mass. App. Ct. at 368, 577 N.E.2d 1012.

Secondly, the testimony regarding the petitioner's statement to his brother to shoot

20

Brogan during the confrontation with him was properly admitted as his own statement made in furtherance of a joint venture. *Commonwealth v. Marrero*, 436 Mass. 488, 493, 766 N.E.2d 461 (2002); *Commonwealth v. Hardy*, 431 Mass. 387, 393, 727 N.E.2d 836 (2000), quoting *Commonwealth v. Clarke*, 418 Mass. 207, 635 N.E.2d 1197 (1994) ("Under the joint venture exception to the hearsay rule, '[o]ut-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it' "). Such statements are an exception to the hearsay rule and therefore do not violate the right to confrontation under *Bruton v. United States*, 391 U.S. 123 (1968) and did not violate the petitioner's due process rights in this case. Furthermore, the petitioner would not have been guaranteed the right to cross-examine his brother regarding his alleged statements to Brogan even in a separate trial, where his brother would not have been compelled to testify at a severed trial.

Therefore, the Appeals Court's decision that the trial court properly denied the petitioner's motion to sever was not an unreasonable application of Supreme Court law. The petitioner has failed to show that his defense was mutually antagonistic from that of his brother and in light of the evidence of joint venture, the petitioner has failed to show that the joint trial compromised a specific trial right or prevented the jury from making a reliable judgment about guilt or innocence. He is not entitled to habeas relief on this claim.

## **CONCLUSION**

For all the foregoing reasons, the respondent respectfully requests that the petition for

a writ of habeas corpus be denied.

Respectfully submitted,
THOMAS F. REILLY
Attorney General


/s Susanne G. Reardon
Susanne G. Reardon, BBO # 561669
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2832

Date: May 17, 2004

22

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the petitioner's counsel on May 17, 2004, by depositing the copy in the office depository for collection and delivery by first-class mail, postage pre-paid, to her as follows:

Karen Elizabeth Morth, Esq.
67 Wall Street, 22nd Floor, #5720
New York, NY 10005


<u>/s Susanne G. Reardon</u>
Susanne Reardon